UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


FORD MOTOR COMPANY, and
FORD GLOBAL TECHNOLOGIES
LLC,

                    Plaintiffs,

                                        Case No. 20-CV-10518

         vs.
                                        HON. GEORGE CARAM STEEH


AIRPRO DIAGNOSTICS LLC,

                    Defendant.
_____/

OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO LIABILITY ONLY (ECF NO. 69),
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF
NO. 83) AND DISMISSING COUNT FOUR OF THE COMPLAINT

This action involves software used to provide diagnostic services for

Ford vehicles. Plaintiffs, Ford Motor Company and Ford Global

Technologies, LLC (collectively "Ford"), created the Integrated Diagnostic

System and the Ford J2534 Diagnostic Software (collectively "Ford

Diagnostic Software") which are at issue in this lawsuit. Defendant AirPro

Diagnostics, LLC ("AirPro") uses the Ford Diagnostic Software in

connection with its business of providing remote scanning and calibration

services to its vehicle repair and collision shop customers.

Ford brings its motion for partial summary judgment (ECF No. 69) as to four counts of its seven-count complaint. Ford alleges that AirPro violates the terms of the End-User License Agreement governing the use of Ford Diagnostic Software. As a result of these alleged violations, Ford asserts breach of contract (Count 7) and copyright infringement (Count 6). Ford alleges trademark dilution (Count 5) based on AirPro's misappropriation of Ford's marks to promote AirPro's goods and services. Ford also claims trademark infringement (Count 1) because AirPro allegedly used precise replicas of Ford's trademarks to pass off aftermarket software as Ford Diagnostic Software.

AirPro moves for summary judgment (ECF No. 83) as to all seven counts of Ford's complaint. In addition to seeking summary judgment in its favor on the counts described above, AirPro also seeks summary judgment on Ford's claims of false designation of origin (Count 2), unfair competition (Count 3), and violations of Michigan's Uniform Trade Practices Act (Count 4). For the reasons set forth in this opinion and order, summary judgment is granted in favor of Ford as to liability only on its breach of contract, copyright infringement, trademark dilution and trademark infringement claims. AirPro's motion for summary judgment is denied. Ford's claim

brought under the Michigan Uniform Trade Practices Act (Count 4) is
dismissed.

<div align="center">FACTUAL BACKGROUND</div>

I.      General Background

AirPro is in the business of performing remote automotive diagnostic
services primarily to independent collision repair shops and Original
Equipment Manufacturer ("OEM") dealership body shops. AirPro performs
its services for its customers by utilizing a product called a scan tool. The
scan tool is loaded with diagnostic software designed to diagnose and meet
warranty repair guidelines set by the OEMs. AirPro's customers connect
the scan tool directly to a vehicle's diagnostic port to extract current and
historical information from the vehicle for the purpose of identifying issues
that are necessary or advisable to address in repairing the vehicle. AirPro's
technicians are located on AirPro's premises and remotely access the
information provided by the scan tool, which is located on the customer's
premises. The service provided by AirPro's technicians is to ensure that no
issues are missed and that the repair is performed properly by the repair
shops.

Scan tools can be classified as either OEM or aftermarket. An OEM
scan tool is specific to a particular manufacturer's line of vehicles, covers

functions available for the manufacturer's models, and meets warranty repair guidelines as set by the OEM. AirPro markets its aftermarket scan tool as a replacement for multiple OEM scan tools because AirPro's scan tool is compatible with diagnostic software from multiple OEMs. See ECF No. 69-16, PageID.1206-08.

II.   Breach of Contract and Copyright Infringement

Ford created its Ford Diagnostic Software, which it licenses to provide dealership-level vehicle diagnostic coverage and programming for Ford vehicles. Ford holds valid copyrights in its Ford Diagnostic Software. Ford itself does not engage in the diagnosis or repair of vehicles.

AirPro's scan tool uses a combination of OEM direct software and third-party aftermarket software that incorporates OEM data.[1] With regard to its work on Ford vehicles, AirPro's practice is to first run a scan using the aftermarket software contained within the AirPro scan tool. If AirPro determines that the Ford-specific software is necessary, then Ford Diagnostic Software is installed on the AirPro scan tool located on the customer's premises.

---

[1] OEMs provide diagnostic repair information to the Equipment and Tool Institute ("ETI") Tek-Net library for use by after market scan tool companies, as further explained below.

From its founding in April 2016 until August 2019, AirPro licensed Ford Diagnostic Software in its own name, governed by the terms of Ford's End-User License Agreement ("EULA"). AirPro purchased multiple short-term licenses and one long-term license for Ford Diagnostic Software. AirPro used the long-term license on one AirPro scan tool at a time. AirPro's practice was to release the license from a scan tool when a job was finished and then transfer it to another AirPro scan tool when needed for another customer. AirPro's position is that Ford authorized the transfer of long-term licenses between computers by a licensee by providing directions for doing so on its motorcraftservice.com website.

On August 15, 2019, Ford's intellectual property counsel sent AirPro a cease and desist letter claiming in part that AirPro had been wrongfully replicating Ford's Diagnostic Software, as well as violating the terms of the EULA. Among the wrongful acts alleged by Ford were that AirPro did not use the Ford Diagnostic Software for its internal use on its premises for the direct repair of a vehicle and no other purpose; AirPro made unauthorized copies of the Ford Diagnostic Software on its scan tools; AirPro infringed and diluting Ford's trademarked logo to promote its goods and services; and AirPro caused confusion in the market about the source and origin of its scan tool. ECF No. 77-7.

On September 18, 2019, AirPro's counsel informed Ford's counsel it was ending its practice of transferring the long-term licenses between its scan tools and adopting a new policy of having its customers directly license the Ford Diagnostic Software. AirPro did not believe it had been in breach of the EULA, but it adopted its new practice to maintain a good relationship with Ford. ECF No. 77-8. The new agreements between AirPro and its customers state that "CUSTOMER shall . . . acquire an End User License Agreement ('EULA') as Licensee from the OEM for placement on the AirPro tablet." Services Agreement, at ¶21; ECF No. 77-13, PageID.1636. The standard agreement AirPro enters with its customers also includes an acknowledgement by the customer that AirPro is not performing any part of the customer's repair service. *Id*., PageID.1634.

At some point prior to the filing of this lawsuit, AirPro's Vice President of Strategic Business Operations, Josh McFarlin, sent an email to David Johnson at Ford, sharing AirPro's desire to discuss an enterprise license agreement specific to AirPro's business model, that considers "new technology and methods to delivery diagnostic support and services effectively to collision repair centers." ECF 69-5, PageID.1153; *see also* Chuck Olsen dep., pp. 117-120, ECF No. 69-3, PageID. 1134-37. No such an agreement was entered between the parties.

- 6 -

III.    Trademark Dilution and Infringement

Ford has trademark rights in the FORD® and FORD OVAL® trademarks ("Ford Marks") for use in connection with vehicle repair and maintenance services. The Ford Marks are ranked among the most valuable brands in the world. See, Forbes, *The World's Most Valuable Brands* (ranking FORD as the 68th most valuable brand in the world in 2020, with an estimated brand value of $11.2 billion); InterBrand, *Best Global Brands 2020* (ranking FORD as the 42nd most valuable brand, with an estimated brand value of $12.568 billion). Ford has identified several instances in which AirPro displayed the Ford Marks on its website and Facebook page, as depicted in screenshots submitted by Ford in this lawsuit. ECF No. 1-1, PageID.36; ECF No. 69-16, PageID.1205-08.

The parties disagree whether AirPro's intent in using the images was to promote AirPro or some other reason. AirPro acknowledges that the Ford Marks were used in connection with its effort to respond to misrepresentations made by one of its competitors, a company known as asTech. One alleged misrepresentation made by asTech was that AirPro did not have the capability to use OEM licensed software. AirPro contends that it created a page for its website, called the "Truth Campaign," with the sole and limited purpose of refuting asTech's assertions. The webpage

includes logos of 29 different car companies, including Ford's Marks, under the text: "OEM Scan Tool Software Applications resident directly on the AirPro Tool". ECF No. 1-1, PageID.36.

In addition, one page from an AirPro slide deck promoting their scan tool states, "ALL services provided utilize OEM software and technical service information which meet or exceed OEM requirements!" This statement appeared alongside 36 vehicle brand logos including Ford's Mark. ECF No. 69-2, PageID.1114. Chuck Olsen, AirPro's Senior VP of Automotive Technology Solutions, stated that while the slide deck may have been sent to AirPro customers, as soon as he saw this slide he removed it from the slide deck, no later than mid-2018. Olsen explained that he did this because he did not agree with the language used on the slide. Olsen Declaration, ¶¶ 5-7; ECF No. 77-3, PageID.1541.

Ford also alleges that AirPro differentiates its products from its competitors' products by describing them as "validated as OEM compliant." However, Ford contends it has never validated AirPro's product. In response, AirPro explains that its statement refers to the hardware used in the AirPro scan tool, which meets OEM PC specification requirements and is compliant with multiple OEM diagnostic and programming applications. ECF No. 77, PageID.1512.

Finally, a photo posted to AirPro's Facebook page in January 2019

features an AirPro tablet in the interior of a vehicle that shows the Ford logo

on the steering wheel. ECF No. 69-16, PageID.1208. AirPro contends that

the presence of the Ford logo is not an attempt to identify Ford as the

source of AirPro's product or services, nor could it be reasonably

interpreted as an endorsement by Ford.

IV.     False Designation of Origin and Unfair Competition

Ford's Position Statement for collision repairs states:

It is important to utilize Ford repair procedures for all collision
repairs to ensure quality results. Ford also recommends the use
of the Integrated Diagnostic System (IDS) or Ford Diagnosis
and Repair System (FDRS) to perform all vehicle diagnostic
testing, module programing, and system calibrations during
collision repairs.

ECF No. 69-11, PageID.1186. AirPro released its own statement, which

attached Ford's position statement and indicated:

Ford recommended shops use the Integrated Diagnostic
System or Ford Diagnostic and Repair System OEM software
for all scans, calibrations and programming on Fords and
Lincolns. AirPro meets this requirement with the use of the Ford
approved J-2534 interface.

ECF No. 69-18, PageID.1210. In line with the policy statements, on

January 23, 2020, AirPro posted a picture on its Facebook page that stated

in part, "We only use OEM licensed software to get the job done right . . . ."

ECF No. 69-17, PageID.1209.

Ford alleges that AirPro's statements about using only OEM licensed software are deceptive. This is based on the fact that AirPro admits that it uses AutoEnginuity's Giotto software product to perform 96-98% of its diagnostic scans of Ford vehicles. Margol dep. 93-94, ECF No. 69-8, PageID.1177-78; Olsen dep. 145-147, ECF No. 69-3, PageID.1139-40. AirPro uses Giotto as a first step, and if it determines that Ford Diagnostic Software is needed for some reason, then that is used as a second step. ECF No. 77, PageID.1513. AirPro's position is that both software obtained directly from an OEM, like the Ford Diagnostic Software, or through the ETI Tek-Net library, like Giotto, provides true OEM scan tool functionality.

In 2013, the State of Massachusetts passed right to repair, or "R2R," legislation. The overarching purpose of this legislation was to give consumers choices about where and how to have their vehicle serviced, rather than being forced to take it to an OEM dealership. In 2014, a Memorandum of Understanding ("MOU") related to the R2R legislation was executed by the OEMs, including Ford. The effect of this agreement was to extend the scope of the R2R legislation beyond Massachusetts and make it national. Olsen Am. Decl. at ¶10, ECF No. 112-2, PageID.2701-2702.

The "R2R Agreement" that accompanied and was incorporated into the MOU also contained a specific provision requiring that "[e]ach

manufacturer shall provide diagnostic repair information to each aftermarket scan tool company . . . for the sole purpose of building aftermarket diagnostic tools[.]" R2R Agreement at §2(b)(ii), ECF No. 83-5, PageID.1947. The R2R Agreement also states that "[c]ommencing in Model Year 2018" the OEMs were required to "provide access to their onboard diagnostic and repair information system" using a vehicle interface like the one utilized by AirPro. Olsen Am. Decl., at ¶12, ECF No. 112-2, PageID.2702; R2R Agreement at §(2)(c)(i), ECF No. 83-5, PageID.1947.

ETI is the leading trade association in the scan tool aftermarket and is the intended depository of the R2R information from all OEMs, including Ford. Olsen Am. Decl. at ¶14, ECF No. 112-2, PageID.2702. Olsen testified that he believed, given the manner in which OEM data is provided to ETI and used by third-party scan tool makers, phrases such as "OEM sourced" and "OEM compliant" are accurate definitions. Olsen developed this belief after discussing the issue with Greg Potter, the Chief Technology Officer of ETI. Olsen dep. at 58, 60, ECF No. 83-2, PageID.1911-12. Pat Lawson, Ford's Diagnostic Product Service Manager, testified that whether diagnostic software data is provided directly by Ford to third parties or whether it flows through ETI is inconsequential, as the data is the same. Lawson Dep Tr at 29, ECF No. 83-6, PageID.1957.

- 11 -

<u>STANDARD FOR SUMMARY JUDGMENT</u>

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014); *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

ANALYSIS

I.   Breach of Contract

Under Michigan law, a plaintiff claiming a breach of contract must prove: "(1) a contract between the parties, (2) the terms of the contract require performance of a certain action, (3) a breach, and (4) the breach caused injury to the other party." *Green Leaf Nursery, Inc. v. Kmart Corp.*, 485 F. Supp. 2d 815, 818 (E.D. Mich. 2007).

A. EULA § 1(a)

Ford asserts a claim that AirPro breached the following terms of § 1(a) of the EULA:

§ 1(a):   YOU may install and use this Product only for Your internal use on Your premises for the direct repair of a vehicle and for no other purpose. . . .

Ford argues that AirPro has breached § 1(a) in at least three ways. First, AirPro is the entity using the Ford Diagnostic Software, not the repair facility. Furthermore, by using the Ford Diagnostic Software to remotely provide diagnostic services to its customers, AirPro's use of the software is not for AirPro's "internal use."

Second, AirPro installs and uses Ford Diagnostic Software on equipment located at its customers' facilities, not on AirPro's "premises" as required by the terms of the EULA.

- 14 -

Third, AirPro is not involved in the "direct repair of a vehicle." In fact, the service agreement that AirPro requires its customers to sign expressly requires the customer to "acknowledge and agree" that AirPro "is not performing any part of the CUSTOMER'S repair service." ECF No. 77-13, PageID.1634. As argued by AirPro's counsel in an earlier court proceeding: "the way our business works, we don't repair vehicles at AirPro, as Ford well knows." ECF No. 49, PageID.780.

Before its policy change in September 2019, AirPro acknowledges that it agreed to the terms of the EULA each time it uploaded the Ford Diagnostic Software onto its scan tool. AirPro contends that it complied with the terms of the EULA because the scan tool was located on the same premises where the vehicle was being serviced and the Ford Diagnostic Software was used in connection with the direct repair of a vehicle.

AirPro's position does not conform with the requirements of §1(a) of the EULA. The EULA does not require that the Ford Diagnostic Software be located on the same premises as the vehicle which is being serviced. Rather, it expressly requires that the Ford Diagnostic Software be installed and used on the *licensee's* premises. The EULA also requires that the Ford Diagnostic Software be used by the licensee only for its internal use and only for the direct repair of a vehicle. While AirPro contends that it licensed

the software and acted as an agent of the collision shops who used the

software to repair vehicles, that is not a position that complies with the clear

terms of the EULA. There is no issue of material fact that AirPro violated

the terms of the EULA prior to September 2019.

AirPro changed its policy on September 18, 2019, in response to

Ford's cease and desist letter. From that point forward, AirPro contends

that the licensees of the Ford Diagnostic Software were its customers.

Therefore, AirPro argues that after September 2019 it no longer contracted

with Ford, so it cannot be liable for a breach of contract after that date.

Deposition testimony taken in this case describes AirPro's practices

after September 18, 2019. AirPro's CEO Lonnie Margol testified that

AirPro, acting as the customer's agent, would enter its customer's name as

licensee of the Ford Diagnostic Software, and then pay the licensing fee

using a gift card. Margol dep. p. 156-57, ECF No. 105-2, PageID.2440-

2441. AirPro explained that it used gift cards rather than its credit card to

pay the license fee to avoid causing confusion with Ford as to which entity

was the licensee. McFarlin dep. p. 130, ECF No. 105-4, PageID.2458.

AirPro also employed procedures to ensure its customers could not access

or use the Ford Diagnostic Software, such as by deactivating the license

after completing the service or restricting access to the user account with a

password. McFarlin dep. p. 62, ECF No. 69-14, PageID.1195. AirPro explained it did this because "[it didn't] trust the diagnostic acumen of the guys in the shop to use the software without a qualified technician behind it . . . ." Olsen dep. p. 154, ECF No. 69-3, PageID.1144.

The evidence is clear that the way AirPro's business model is structured means it could not abide by the terms of the EULA. AirPro used the Ford Diagnostic Software for its customers' benefit, the software was not located on AirPro's premises and AirPro was not involved in the direct repair of vehicles. AirPro took the step of naming its customers as the licensees, but in each instance, AirPro was still the entity that installed and used the Ford Diagnostic Software. The preamble of the EULA states:

> YOU AGREE TO BE BOUND BY THE TERMS OF THIS EULA BY INSTALLING, COPYING, OR OTHERWISE USING THE PRODUCT.
>
> IF YOU DO NOT AGREE, DO NOT INSTALL OR USE THE PRODUCT.

Pursuant to this language, AirPro was the licensee each time it used the Ford Diagnostic Software, both before and after September 18, 2019. The Court finds that AirPro was in breach of § 1(a) of the EULA as alleged by Ford.

B. <u>EULA § 9</u>

Ford alleges that AirPro also breached § 9 of the EULA, which

provides:

> § 9:    Neither this Agreement nor any rights granted hereunder, in
> whole or in part shall be assignable or otherwise transferable
> by YOU. Nothing in this Agreement grants to YOU the right
> to assign, sell, lease, loan or otherwise transfer Product in
> whole or in part to a third party.

The EULA at § 9 prohibits the transfer of licenses to third parties.

AirPro's business model requires that when AirPro determines it is

necessary to use Ford Diagnostic Software, the software must be installed

on a scan tool located at its customer's location so an off-site AirPro

technician can obtain information to help the customer repair the vehicle.

Ford argues that when AirPro transfers the Ford Diagnostic Software from

one scan tool to another scan tool used by another customer, it does so in

violation of § 9 of the EULA.

AirPro admits that prior to September 2019, it would release a license

from one scan tool and then transfer it to another scan tool. AirPro

contends that this was permissible conduct as supported by Ford's own

website that provided instructions on how licensees could transfer software

to a different device. However, the fact that Ford provides instructions on

how to transfer software is not a grant of permission to make a transfer in

violation of the terms of the EULA. This position is also supported by the

fact that the EULA is a <u>fully integrated agreement</u>, as stated in an

integration clause labeled "ENTIRE AGREEMENT":

> This EULA, including any addendum or amendment to this
> EULA which is included with the Product, are the entire
> agreement between YOU and FORD relating to the Product
> and the support services (if any), and they supersede all prior
> or contemporaneous oral or written communications, proposals
> and representations with respect to the Product or any other
> subject matter covered by this EULA. <u>To the extent the terms of
> any FORD policies or programs for support services conflict
> with the terms of this EULA, the terms of this EULA shall
> control.</u>

ECF No. 1-9, PageID.71, § 11 (emphasis added).

The EULA specifies the application of Michigan law. "Michigan

follows the parol evidence rule which does not permit extrinsic evidence to

be used to contradict the terms of a written contract that was intended to be

the final and complete expression of the parties' agreement." *Cook v. Little

Caesar Enter.*, 210 F.3d 653, 656 (6th Cir. 2000). The determination of

whether contract language is ambiguous, such that extrinsic evidence may

be considered, is a question of law, as is the interpretation of non-

ambiguous contractual language. *Zacks v. Zacks*, No. 342274, 2020 WL

6814651, at *2 (Mich. Ct. App. Nov. 19, 2020), appeal denied, 960 N.W.2d

528 (Mich. 2021).

- 19 -

AirPro argues that the EULA is ambiguous because AirPro's business model is inconsistent with the scope of the licensed rights provided by the EULA. However, the fact that the EULA contemplates a different use than the model adopted by AirPro does not render the EULA ambiguous. "The conclusion that parol evidence is not admissible to show that a written agreement is not integrated when the agreement itself includes an integration clause is consistent with the general contract principles of honoring parties' agreements as expressed in their written contracts and not creating ambiguities where none exist." *UAW-GM Hum. Res. v. KSL Recreation Corp.*, 579 N.W.2d 411, 415 (Mich. Ct. App. 1998) (applying Michigan law). Absent fraud or "the rare situation when the written document is obviously incomplete 'on its face,'" parol evidence is irrelevant and inadmissible. *Id*. AirPro has made no allegations of fraud or that the EULA is incomplete on its face.

Next, the Court concludes that AirPro's frustration of purpose defense is not a winning argument. The Restatement (Second) of Contracts § 261 notes that a contractual obligation can be discharged when "a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." The Sixth Circuit explained: "the purpose

frustrated by the supervening event must have been the 'principal purpose' of the party making the contract." *Karl Wendt. v. International Harvester*, 931 F.2d 1112, 1119 (6th Cir. 1991). AirPro's "frustration of purpose" defense is based on the fact that the terms of the EULA conflict with its business model. But AirPro was apparently unsuccessful in its effort to negotiate an enterprise contract with Ford rather than agreeing to be bound by the terms of the EULA. By opting to use the Ford Diagnostic Software without an enterprise contract, AirPro became bound by the terms of the EULA.

The above discussion affirms that § 9 prohibits AirPro from transferring the Ford Diagnostic Software to a third party. Here, AirPro admittedly transferred its long-term license to different scan tools for use with different customers prior to September 18, 2019. Such acts were taken in violation of § 9 of the EULA.

C. Damages

A final element of breach of contract is damages. AirPro argues that Ford cannot establish any damages because Ford is paid for the use of its software whether AirPro is the licensee or the shop with which AirPro is working is the licensee. However, the evidence shows that Ford is damaged because it loses out on licensing revenue that would otherwise

be paid were it not for AirPro's practice of releasing and transferring its license. In addition, Ford is entitled to damages for each act AirPro took that violated the scope of its license.

While the amount of damages has not been fully developed in the record, there is no issue of material fact that Ford was harmed by AirPro's breach of contract. Summary judgment on Ford's claim of breach of contract is GRANTED as to liability in favor of Ford and against AirPro.

II.   Copyright Infringement

The elements of a copyright infringement claim are (1) ownership of the copyright by the plaintiff; (2) copying by the defendant. *Zomba Enters. Inc. v. Panorama Records, Inc.*, 491 F. 3d 574, 581 (6th Cir. 2007). "A licensee who exceeds the scope of its copyright license infringes the licensed copyright." *Quinn v. Detroit*, 23 F. Supp.2d 741, 749 (E.D. Mich. 1998). *See also, Design Basics, LLC v. Chelsea Lumber Co.*, 977 F. Supp.2d 714, 729 (E.D. Mich. 2013) ("A particular use of copyrighted material is outside the scope of a licensing agreement if that particular use is not authorized by the license agreement"); 3 Nimmer on Copyrights § 10.15 (2021) ("More generally, when a license is limited in scope, exploitation of the copyrighted work outside the specified limits constitutes infringement").

It is not disputed that Ford holds copyrights in the Ford Diagnostic Software. The Copyright Act gives the owner of a copyright exclusive rights including the right to authorize the reproduction of the copyrighted work and the distribution of copies by way of transfer of ownership or by rental, lease or lending. 17 U.S.C. § 106(1) and (3). Ford alleges that AirPro has violated each of these exclusive rights.

Installing software constitutes "reproduction" on the hard drive of the target device. *See, e.g., MAI Sys. v. Peak Computer*, 991 F.2d 511, 518 (9th Cir. 1993). Therefore, each time AirPro installed Ford's copyrighted software, it made a new copy. Every installation of the Ford Diagnostic Software contrary to the terms of the EULA is an impermissible reproduction prohibited under the Copyright Act.

With respect to long-term licenses, AirPro acknowledges that prior to September 18, 2019, it "would use the licensed software on one AirPro scan tool (a computer) at a time (as permitted). It would then release the license from that scan tool when finished until the next use was needed on another AirPro scan tool." ECF No. 1-11, PageID.76. As discussed above, § 9 of the EULA provides, "Nothing in this Agreement grants to YOU the right to assign, sell, lease, loan or otherwise transfer Product in whole or in part to a third party." AirPro's release-and-reuse tactic is a transfer of the

software that violates Ford's copyright by exceeding the scope of the EULA. 17 U.S.C. § 106(3).

AirPro's actions in purchasing short-term licenses in the names of their customers, loading the software on the scan tool, using the software to perform diagnostic services, and then blocking its customers from accessing the software is also a violation of § 106(3). As the installer and user of the software, AirPro is the licensee. Ford granted AirPro the right to use the Ford Diagnostic Software only under the conditions identified in § 1(a) of the EULA. AirPro's use outside the scope of that grant – for external use, off of its premises, and not for the direct repair of vehicles – is an infringement of Ford's copyright.

Ford's motion for summary judgment as to copyright infringement is GRANTED as to liability and AirPro's motion for summary judgment is DENIED.

III.    Trademark Claims

A.    Trademark Dilution

In its trademark dilution claim, Ford alleges that AirPro's use of the Ford Marks causes harm to the distinctive quality of the marks by lessening their capacity to identify and distinguish Ford's goods and services from those of others. ECF No. 1, PageID.25. To prevail on its claim of trademark

dilution, Ford must show that (1) its marks are famous, (2) its marks are distinctive; (3) the defendant used the marks in commerce; (4) the defendant's use began after the marks became famous; and (5) the defendant's use is likely to cause dilution of the distinctive quality of the marks. 11 U.S.C. § 1125(c)(1); *Audi AG v. D'Amato*, 469 F.3d 534, 547 (6th Cir. 2006). AirPro argues it is entitled to summary judgment because Ford is unable to establish the third and fifth elements of its trademark dilution claim.

### 1. Use of Marks in Commerce

This district has addressed the "commercial use in commerce" requirement, describing it as requiring "proof that the defendant has engaged in exchange (commonly through buying or selling), or other activities that have profit as their primary aim." *Ford Motor Co. v. Greatdomains.com, Inc.*, 177 F. Supp. 2d 635, 648-49 (E.D. Mich. 2001). AirPro argues that the "primary aim" of its use of the Ford Marks, along with the logos of dozens of other OEMs in its Truth Campaign, was not profit, but rather to refute competitor asTech's misrepresentations regarding AirPro's capabilities.

AirPro describes its use as a non-trademark use, which does not dilute Ford's trademark. "[T]here can be no dilution if customers will see

that the word is not used to identify the source of defendant's product, but only to describe some aspect of the product." *Ford Motor Co. v. InterMotive*, No. 4:17-CV-11584, 2019 WL 4746811, at \*10 (E.D. Mich. Sept. 30, 2019). AirPro maintains that its Truth Campaign describes an aspect of its scan tool and the software it is capable of using, as opposed to identifying the source of the software. This position is contrary to the testimony of AirPro's CEO Lonnie Margol, who stated that AirPro used Ford's Marks, along with the logos of 28 other OEMs, below the text "OEM Scan Tool Software Applications resident directly on the AirPro Tool," to indicate that OEM software is loaded directly on the AirPro scan tool. Margol dep. p. 93, ECF No. 105-2, PageID.2438; ECF No. 1-1, PageID.36.

AirPro's Truth Campaign likely had more than one goal in comparing its product with asTech's scan tool and asserting the ways in which AirPro's scan tool was superior. But the Truth Campaign went beyond just refuting alleged misrepresentations. It was a whole product comparison, directed toward AirPro's potential customers, which asserted the ways in which AirPro's scan tool was superior to asTech's scan tool. Similarly, AirPro's other advertisements and posts that used the Ford Marks promoted AirPro's commercial services and can be said to have profit as their primary aim. See ECF No. 69-16, PageID.1206-1207.

The Court finds there is no issue of material fact that AirPro used Ford's Marks in commerce.

2. Likely to Cause Dilution

The Supreme Court has held that the use of identical marks on similar goods establishes the final element of likelihood of dilution as a matter of law and is an "obvious case", *Moseley v. V. Secret Catalogue*, 123 S.Ct. 1115, 1125 (2003). AirPro used Ford's trademarked logo in the promotion of its product, making this an obvious case of trademark dilution.

As to Ford's claim of trademark dilution, Ford's motion for summary judgment is GRANTED as to liability and AirPro's motion for summary judgment is DENIED.

B.    Trademark Infringement

Ford has sold automobiles and related goods and services under its world-famous Ford Marks for over a century. Ford alleges that AirPro has used the Ford Marks, without Ford's authorization and with the deliberate intent of unfairly benefitting from the goodwill inherent therein. Ford further alleges that AirPro's misappropriation of the Ford Marks is done to cause confusion and to deceive consumers concerning the source or sponsorship of AirPro's products and services and is likely to cause confusion in the marketplace and among purchasers of diagnostic services. Ford seeks

injunctive relief and damages due to AirPro's infringement of the Ford Marks.

To state a claim for trademark infringement, a plaintiff must allege facts establishing that: (1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009). The first factor is undisputed here. As to the second factor, the Court has already concluded that AirPro used Ford's Marks in commerce. In addressing likelihood of confusion, the Court must first consider the preliminary question: "whether the defendants 'are using the challenged mark in a way that identifies the source of their goods.'" *Hensley*, 579 F.3d at 610 (quoting *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003)). "If they are not, then the mark is being used in a 'non-trademark way' and trademark infringement laws, along with the eight-factor analysis, do not even apply." *Id.* (internal quotations omitted).

AirPro's position is that it displayed the Ford Mark, along with the logos of other OEMs, only to demonstrate that AirPro's scan tool is compatible with OEM diagnostic software. AirPro argues that it defies logic

- 28 -

to conclude that it was attempting to identify 29 separate OEMs as the source of its scan tool.

While AirPro's use of the Ford Marks does not identify Ford as the source of its scan tool, it admittedly intended to identify Ford, as well as other OEMs, as the source of the software that can be used on its scan tool. For example, a slide that appeared in an AirPro slide deck displayed Ford's Mark alongside the statement: "ALL services provided utilize OEM software . . . ." ECF No. 69-2, PageID.1114. According to AirPro, that slide was quickly removed by Olsen because he believed it was an untrue statement. The Truth Campaign used Ford's Mark as one example of "OEM Scan Tool Software Applications resident directly on the AirPro Tool." ECF No. 1-1, PageID.36. It cannot be disputed that in these instances AirPro set out to identify Ford as one source of OEM software used on its scan tool, not just to claim that its scan tool is compatible with Ford's Diagnostic Software.

Ford bears the burden of establishing that AirPro's use of Ford's Marks creates a likelihood of confusion regarding the source of goods or services offered. *See Progressive Distribution Services, Inc. v. United Parcel Services, Inc.*, 856 F.3d 416, 424 (6th Cir. 2017). Ford argues that likelihood of confusion is presumed in this case because AirPro

intentionally copied Ford's Marks "with the intent to derive a benefit from the reputation of another." *Ford Motor Co. v. Lloyd Design Corp.*, 22 F. App'x 464, 467 (6th Cir. 2001). Ford claims that AirPro infringed its trademark by using Ford's logo to pass off aftermarket software - the Giotto software that it admittedly uses for most of its services - as genuine Ford Diagnostic Software. At a minimum, AirPro's use of the Ford Marks was intended to cause confusion as to the source of the software it uses. *See Maker's Mark Distillery, Inc. v. Diageo North Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012) (trademark infringement encompasses both direct palming off as well as 'confusion of sponsorship").

To determine whether AirPro's use of Ford's Marks caused a likelihood of confusion, the Court may consider the following factors: "(1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion in selecting the mark." *Audi AG v. D'Amato*, 469 F.3d 534, 542-43 (6th Cir. 2006).

1. Strength of Ford's Marks

There is no dispute that the Ford Marks are strong and inherently distinct.

2.  Relatedness of Goods

The goods at issue here are OEM versus third-party diagnostic software, which are closely related.

3.  Similarity of Marks

Similarity of marks is established because AirPro uses exact copies of Ford's Marks.

4.  Actual Confusion

Ford points to evidence from AirPro's records where an AirPro customer requested to use Ford Diagnostic Software instead of Giotto software and was told "not to worry about it." ECF No. 69; Ex. J. The repair at issue was of a vehicle model that pre-dated 2018 and was therefore not included in the Ford Diagnostic Software. This evidence does not directly support a finding of actual confusion by AirPro customers.

5.  Marketing Channels

The target market for scan tools and diagnostic software, whether OEM or third-party, is identical – repair and collision shops engaged in the service or repair of vehicles.

6.  Degree of Purchaser Care

Ford refers to AirPro's description of its customers as unsophisticated regarding scan tools and software to support the contention that they will

erroneously conclude that AirPro uses genuine Ford Diagnostic Software
based on AirPro's use of Ford's Marks and its false claims regarding its use
the OEM software. This argument is consistent with AirPro's position that it
does not give the customer direct access to the software because "[it
doesn't] trust the diagnostic acumen of the guys in the shop to use the
software without a qualified technician behind it . . . ." Olsen dep. p. 154,
ECF No. 69-3, PageID.1144. This statement is more directed to using the
diagnostic software and does not directly address the issue of whether the
purchaser is aware of the source of the software. There is no material
evidence presented from which the Court can evaluate the degree of
purchaser care in this case.

    7. Defendant's Intent

    Intent to infringe is not necessary for a finding of likely confusion, but
the presence of intent strengthens that conclusion. *Champions Golf Club,
Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1121 (6th Cir. 1996)
(citation omitted). Ford maintains that by using Ford's Marks, AirPro intends
to benefit from Ford's reputation and goodwill by conveying the false
message that it uses Ford's genuine software rather than aftermarket
software. The evidence presented in this case, that AirPro admits to using
third-party diagnostic software for 96-98% of its scans, supports Ford's

argument that AirPro intends to deceive the market into believing that it uses Ford's OEM software more often than it does. This position has even more support considering Olsen's explanation why the term "aftermarket" has a bad connotation in the collision industry and should be avoided. ECF No. 105-3, PageID.2444-2445. Given the strength of Ford's Marks, AirPro's intent in choosing to include the marks in some of its promotional materials weights in favor of finding likelihood of confusion.

8. Likelihood of Expansion

This factor does not favor either side.

The Ford Marks are among the strongest in the world and AirPro used exact copies on materials that promote closely related products in commerce to customers in the same market. While Ford has not demonstrated actual confusion or the degree of purchaser care, the above factors, particularly evidence of AirPro's intent to deceive, lead the Court to conclude that the use of Ford's Marks by AirPro is likely to cause confusion. Summary judgment is therefore GRANTED as to liability in favor of Ford and against AirPro on Ford's claim of trademark infringement.

IV.  Michigan False Designation of Origin

AirPro moves for summary judgment on Ford's claim of false designation of origin. "The ultimate test is whether the public is likely to be

deceived or confused by the similarity of the marks. . . . Whether you call

the violation infringement, or unfair competition or false designation of

origin, the test is identical – is there 'a likelihood of confusion?'" *InterMotive*,

2019 WL 4746811 at * 9 (citing *Two Pesos v. Taco Cabana*, 505 U.S. 763,

780 (1992)).

AirPro's position is that its display of the Ford logo in connection with

the Truth Campaign and elsewhere cannot in any reasonable way be

viewed as a claim that Ford, or any of the dozens of other OEMs depicted,

is actually the source of AirPro's scan tool or the services that AirPro

provides. First, the relevant inquiry is whether there is a likelihood of

confusion that Ford is the source of the software on AirPro's scan tool.

Second, because the Court has found a likelihood of confusion for

purposes of trademark infringement, AirPro's motion for summary judgment

on Ford's false designation of origin claim is DENIED.

V.    Michigan Unfair Competition

AirPro argues it does not compete with Ford, and there can be no

unfair competition when there is no actual competition. *See Energy*

*Resource Management Corp. v. CMS Energy Resource Management Co.*,

No. 282127, 2009 WL 222431, *1 (Mich. App. January 29, 2009) ("[T]he

trial court concluded that there could be no unfair competition because

there was no evidence of actual competition between plaintiff and defendant."). However, the competition here is between AirPro's scan tool loaded with Giotto diagnostic software versus Ford Diagnostic Software and hardware.

Ford licenses its Ford Diagnostic Software to vendors for a substantial fee. AirPro has sought to portray itself as using only OEM software on its scan tools. According to Ford, this deprives Ford of the license fees it would obtain if AirPro properly licensed Ford's software. In addition, Ford contends that AirPro undercuts Ford's legitimate licensees by marketing its scan tool and services as a substitute for Ford Diagnostic Software and hardware. AirPro claims it provides "[t]he one and ONLY scan tool your shop will EVER need." ECF No. 69-2, PageID.1120; see also ECF No. 69-12, PageID.1187 (touting its "single device" as an alternative to "20-odd OEM scan tools at a cost approaching or reaching six figures."). Under these facts, AirPro falls short of establishing as a matter of law that it is not competing with Ford in this market.

AirPro's second argument is that its conduct cannot constitute unfair competition because the software used on its scan tool is, in fact, "OEM sourced" and "OEM compliant"— meaning that it has deceived no one. The "competition" that Ford claims is "unfair" is the very competition

contemplated by the R2R legislation and the MOU to which Ford is a signatory. However, Ford points out that AirPro is being deceptive where it creates the impression that it uses OEM software in its marketing materials, while admitting that "96 percent of the time" it actually uses aftermarket software. Margol dep. 92, ECF No. 105-2, PageID.2438.

AirPro's third argument is that Ford has not demonstrated that it has suffered damages. Ford describes its damages as stemming from the impact of AirPro's conduct on Ford's multi-million dollar software licensing fees paid by AirPro's competitors. AirPro's services are provided as an alternative to those provided by Ford, either through repair shops directly licensing Ford's software or by AirPro's competitors who have entered into licensing agreements with Ford. As a result, if AirPro is permitted to get away with its misconduct, it will damage Ford by reducing market participants' willingness to properly license Ford's software or reducing what they are willing to pay for those licenses.

The bottom line is that AirPro markets its product as a substitute for Ford Diagnostic Software and hardware and as such is a direct competitor of Ford in the market for diagnostic services. For this reason, as well as the others discussed above, AirPro's motion for summary judgment as to Ford's unfair competition claim is DENIED.

VI.    <u>Michigan Uniform Trade Practices Act</u>

Ford agrees to the dismissal of its claim under the Michigan Uniform

Practices Act.

<div align="center"><u>CONCLUSION</u></div>

For the reasons stated in this opinion and order,

IT IS HEREBY ORDERED that plaintiff's motion for partial summary

judgment (ECF No. 69) is GRANTED as to liability only on plaintiff's breach

of contract, copyright infringement, trademark dilution, and trademark

infringement claims.

IT IS HEREBY FURTHER ORDERED that defendant's motion for

summary judgment (ECF No. 83) is DENIED.

IT IS HEREBY FURTHER ORDERED that plaintiff's claim under the

Michigan Uniform Trade Practices Act (Count 4) is DISMISSED.

Dated:  December 20, 2022

<div style="margin-left:40%">
<u>s/George Caram Steeh</u><br>
GEORGE CARAM STEEH<br>
UNITED STATES DISTRICT JUDGE
</div>

<div align="center">
CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
December 20, 2022, by electronic and/or ordinary mail.

<u>s/Brianna Sauve</u>
Deputy Clerk
</div>